UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

DEBORAH J. BRUMITTE,       )
                          )
        Plaintiff,         )
                          )
v.                        )       No.:  3:08-CV-54
                          )              (VARLAN/SHIRLEY)
MICHAEL J. ASTRUE,         )
COMMISSIONER OF SOCIAL     )
SECURITY ADMINISTRATION,   )
                          )
        Defendant.         )

## MEMORANDUM OPINION

This social security case is before the Court for consideration of Plaintiff Deborah J.

Brumitte's Motion for Summary Judgment [Doc. 13] and Defendant Commissioner's Motion

for Summary Judgment.  [Doc. 16.] Plaintiff Deborah J. Brumitte ("Plaintiff") seeks judicial

review of the decision of the Administrative Law Judge ("ALJ"), the final decision of the

Defendant Michael J. Astrue, Commissioner of Social Security ("the Commissioner").  The

parties have also submitted briefs in support of their respective positions [Docs. 13-2, 17],

and this matter is now ripe for the Court's consideration.

On December 14, 2004, Plaintiff filed an application for supplemental security income

payments, claiming disability as of November 1, 1990. [Tr. 15].  After her application was

denied initially and also denied upon reconsideration, Plaintiff requested a hearing on August

5, 2005. [Tr. 15].   On March 21, 2007, a hearing was held before an ALJ to review

determination of Plaintiff's claim. [Tr. 12].   On April 25, 2007, the ALJ found that Plaintiff

was not disabled. [Tr. 22]. The Appeals Council denied Plaintiff's request for review; thus, the decision of the ALJ became the final decision of the Commissioner. Plaintiff now seeks judicial review of the Commissioner's decision.

## I. ALJ FINDINGS

The ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since November 1, 1990, the alleged onset date (20 CFR 416.920(b) and 416.971 *et seq.*).

2. The claimant has the following severe impairments: substance abuse disorder and personality disorder (20 CFR 416.920(c)).

3. Even considering the substance use, the claimant would not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. Even considering the substance use, the claimant would have the residual functional capacity to perform the wide world of exertion; sit/stand/walk for 6 hours each during an 8-hour workday with normal breaks. The claimant can remember and understand simple and detailed instructions; will have some but not substantial difficulty maintaining concentration, persistence, and pace; will have difficulty interacting with others but still can do; and will have some but not substantial difficulty adopting to change.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on June 18, 1959 and was 45 years old, which is defined as a younger individual age, on the date the application was filed (20 CFR 416.963).

2

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue in this case because the claimant had no past relevant work (20 CFR 416.968).

9. Even considering the substance use, considering the claimant's age, education, work experience, and residual functional capacity, there would be a significant number of jobs that exist in the national economy that the claimant could perform (20 CFR 416.960(c) and 416.966).

10. The claimant has not been under a disability, as defined in the Social Security Act, since December 14, 2004, the date the application was filed (20 CFR 416.920(g)).

[Tr. 17-22.]

## II. DISABILITY ELIGIBILITY

An individual is eligible for SSI benefits on the basis of financial need and either age, blindness, or disability. *See* 42 U.S.C. § 1382(a). "Disability" is the inability "[t]o engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy

3

exists for him, or whether he would be hired if he applied for work. 42 U.S.C. § 1382c(a)(3)(B). Disability is evaluated pursuant to a five-step analysis summarized as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520). The Plaintiff bears the burden of proof at the first four steps. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five. *Id.* At the fifth step, the Commissioner must prove that there is work available in the national economy that the claimant could perform. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987)).

4

## III. STANDARD OF REVIEW

In reviewing the Commissioner's determination of whether an individual is disabled, the Court is limited to determining whether the ALJ applied the correct legal standards and whether there is substantial evidence in the record to support the ALJ's findings. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). If the ALJ's findings are supported by substantial evidence based upon the record as a whole, they are conclusive and must be affirmed. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387 (6th Cir. 2004); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It is immaterial whether the record may also possess substantial evidence to support a different conclusion from that reached by the ALJ or whether the reviewing judge may have decided the case differently. *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir. 1986). On review, Plaintiff bears the burden of proving her entitlement to benefits. *Boyes v. Sec. of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994) (citing *Halsey v. Richardson*, 441 F.2d 1230 (6th Cir. 1971)).

## IV. ANALYSIS

On appeal, Plaintiff argues that substantial evidence does not support the ALJ's disability determination. Plaintiff contends the ALJ erred by finding: (A) the Plaintiff's irritable bowel syndrome (IBS), ovarian cysts, and complaints of hand pain did not limit her physical exertion and (B) the Plaintiff's mental impairments did not meet the level of a listed

5

impairment or impose limitations on her range of work. [Doc. 13-3]. The Commissioner, in response, contends substantial evidence supports the ALJ's findings. [Doc. 17].

## A.      *Plaintiff's Physical Impairments*

In this case, the ALJ found the Plaintiff had no severe physical impairments and had a residual functional capacity that allowed her to exert herself at a wide range of levels. [Tr. 18]. The Plaintiff claims that the ALJ erred in these findings because he relied on the opinions of state agency physicians in making these findings, and as a result, the Plaintiff claims that the ALJ's finding is not supported by substantial evidence of record. [Doc. 13-3 at 8]. The Commissioner argues that objective medical evidence and medical opinion evidence support the ALJ's findings. [Doc. 17 at 11].

The Plaintiff first argues that the ALJ erred by discounting the diagnostic testing which showed the Plaintiff had ovarian cysts that caused abdominal pain. [Doc. 13-3 at 8]. The Commissioner acknowledges that Steven R. Moffett, M.D., ("Dr. Moffett") the Plaintiff's treating physician, diagnosed the Plaintiff with chronic pelvic pain and ovarian cysts, but disputes the allegations that such conditions were severe. [Doc. 17 at 12].

In a letter dated April 20, 2005, Dr. Moffett explained to the Plaintiff's referring physician's assistant that, while the Plaintiff complained of severe pain during her periods, her pain was "otherwise, fairly normal." [Tr. 269]. Further in a July 27, 2005 letter, Dr. Moffett explained that a laproscopy or future hysteroscopy would both aid in treatment of the Plaintiff's condition. [Tr. 260-61]. The record supports the ALJ's conclusion that the Plaintiff's gynecological impairments could be treated and were not severe. [Tr. 21].

6

Next the Plaintiff argues that the ALJ erred by not adequately considering the opinion of Dr. Summers, a consulting expert, who the Plaintiff saw after applying for disability. At the visit, Dr. Summers found the Plaintiff's GI examination to be normal and stated that he "would place no specific work related restrictions on her in this regard. Her condition should be amenable to medical management." [Tr. 144]. Based upon the Plaintiff's own complaints, Dr. Summers remarked that irritable bowel syndrome was a probable condition. [Tr. 143]. The above described evidence supports the ALJ's conclusion that the IBS was not a severe impairment and was treatable, and the Court finds that the ALJ's decision regarding the alleged IBS is supported by substantial evidence of record.

The Plaintiff also contends that her vision impairment was not properly considered in the ALJ's decision. Dr. Summers addressed the Plaintiff's vision complaints at the aforementioned February 15, 2005, office visit. [Tr. 143]. Dr. Summers's impression was that the Plaintiff had "probable astigmatism v. presbyopia," but he noted that the Plaintiff reported she had 20/50 vision and had received no form of treatment for the impairment. [Tr. 143]. Dr. Summers concluded that "[b]ased on her history and exam, it is reasonable to expect that she will have difficulty performing activities requiring normal visual acuity. She appears capable of all other work related activities in this regard." [Tr. 143]. Based on this evidence, the ALJ concluded that the Plaintiff's vision impairment was not severe.

Visual impairments not rising to the level of blindness are evaluated in the same manner as other impairments. Common sense and other regulatory instruction on evaluation of visual impairments indicate that evaluation of a vision disability should be made after the

7

condition has been treated with corrective lenses. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) (holding that severely myopic prospective airline pilots who could see normally with corrective lenses did not have a disability under the ADA). For example, the applicable regulation instructs that blindness, for the purposes of social security disability, be determined using the visual acuity of the eyes with correcting lenses. See 20 C.F.R. § 416.891. Further, evaluating vision impairments without corrective lenses would make a large percentage of the population, who are otherwise able to work, eligible for social security disability benefits.

The Plaintiff's uncorrected visual acuity is 20/50. Based upon her ability to maintain a driver's license and the medical evidence of record, the Court finds that the vision impairment is not a severe condition, even without treatment, and with treatment the condition could likely be cured. Accordingly, the Court concludes that the ALJ's decision that the Plaintiff's vision impairment was not severe is supported by substantial evidence.

Finally, the Plaintiff contends that the ALJ failed to properly consider the Plaintiff's testimony that she had pain and numbness in her hands and legs. The only evidence of these impairments is the Plaintiff's testimony at her hearing before the ALJ. [Tr. 323-24]. The ALJ found that the Plaintiff's ability to care for her personal needs and complete tasks such as housework negated the credibility of her subjective complaints. [Tr. 21]. Applicable regulations instruct claimants that "statements about your pain or other symptoms will not alone establish that you are disabled." 20 C.F.R. § 404.1529(a). Subjective complaints, especially those that appear to the ALJ to be exaggerated, cannot alone establish a severe

8

impairment sufficient to support a finding of disability. Accordingly, the Court concludes that substantial evidence supports the ALJ's finding that the Plaintiff's hand and leg pain were not a severe impairment.

Based on the foregoing, the Court finds that the Plaintiff's overarching argument that the ALJ ignored the Plaintiff's physical impairments when he concluded that the Plaintiff had no exertional limitations is not well-taken. As explained above, the ALJ's findings that the Plaintiff's physical impairments were not severe and did not affect her exertional limitations are supported by substantial evidence

**B.    *Plaintiff's Mental Impairments***

The Plaintiff also argues that the ALJ erred in his determination that the Plaintiff did not meet the criteria for disability contained in 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.05, and that the ALJ erred in his assessment of the availability of work to the Plaintiff in the national economy. The Plaintiff argues that these errors were caused by the ALJ's giving controlling weight to the opinion of Pamela Branton, M.S., ("Ms. Branton"), a consulting expert, while discounting the opinions of other sources, both treating and consulting, and the ALJ's failure to consult a vocational expert. [Doc. 13-3]. The Commissioner argues that the ALJ's findings were supported by substantial evidence and his reliance on Ms. Branton's evaluation was not misplaced. [Doc. 17].

*1.    Review of Evidence from Medical Sources and Other Sources*

Before discussing the sources and opinions available to the ALJ, the Court will briefly review the distinction between treating and consulting sources and between "acceptable

medical sources," "other medical sources," and "non-medical sources." Treating sources are those sources that have seen a claimant more than one time. The ALJ must weigh all medical opinion received when making a disability determination. 20 C.F.R. § 404.1527(d). However, the opinion of a non-treating source will not be given as much weight as that of a treating source. *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 90 (6th Cir. 1985). In the absence of contradicting evidence, treating sources will be given controlling weight, and where there is contradicting evidence, the length and frequency and nature and extent of the treatment will determine the weight accorded to the opinion. 20 C.F.R. § 404.1527(d)(2). Finally, any medical source's opinion will be given more weight if it is supported by other evidence, consistent with the record as a whole, or given by a specialist in the area of inquiry. 20 C.F.R. § 404.1527(d)(3)-(5).

Sources are further divided according to their expertise. Medical and osteopathic doctors and licensed or certified psychologists are classified as "acceptable medical sources." SSR 06-03p at *1. In contrast, nurse practitioners, physician assistants, and licensed clinical social workers are considered "other medical sources." *Id*. at *2. Caregivers and friends are "other non-medical sources." *Id*. Only an "acceptable medical source" can be a treating source and be given controlling weight. *Id.* "Other sources," both medical and non-medical, are used to determine the severity of a claimant's impairment and how it affects the claimant's ability to function. *Id.*

In this case, the Plaintiff sought treatment for her psychological impairments from physicians, who specialized in general medicine or family practice, and from mental health

professionals, who, while qualified to counsel and treat her conditions, were not psychiatrists or physicians. The impressions of physicians and other medical professionals who saw the Plaintiff regularly were inconsistent with Ms. Branton's evaluation of the Plaintiff's psychological condition. The Court has considered the value of these different sources and of Ms. Branton's opinion and, for the reasons more fully explained below, concludes that the opinions and records of the physicians, mental health professionals, and friends who observed and treated the Plaintiff's psychological conditions are entitled to greater weight and deference than the opinion of Ms. Branton.

John S. Burrell, M.D., ("Dr. Burrell") and Ingrid Fernandes, M.D., ("Dr. Fernandes") are both examples of physicians who provided primary care to the Plaintiff but also observed and treated her psychological conditions because these symptoms were interconnected with her overall health. These "acceptable medical sources," opined that the Plaintiff was suffering from depression and anxiety issues. Dr. Burrell,[1] who treated the Plaintiff at the Reaches Community Health Center, noted in his assessment of the Plaintiff on February 8, 2005, that the Plaintiff appeared "very anxious and depressed," although he also noted that the Plaintiff had not been taking her antidepressent medication. The Plaintiff was seen by Dr. Fernandes at the Reaches Community Health Center, during 2006. While the Plaintiff's primary complaints on these visits were not psychological, the dictation and notes from these visits evidence the effect of the Plaintiff's mental conditions on her basic ability to function.

---

[1] The medical records available were credited to and initialed by both Dr. Burrell and Sheila A. Morehead, CFNP. Thus, this source is attributable both to an "acceptable medical source" and to an "other medical source."

In a dictation entry on April 20, 2006, Dr. Fernandes describes a vaginal examination brought about by complaints of discharge. [Tr. 283]. The examination revealed a feminine hygiene product which had been inserted and left in the cervical area, for an extended period. Because the Plaintiff appeared unable to complete the routine use and removal of such products, Dr. Fernandes instructed the Plaintiff not to use insertable feminine hygiene products in the future. [Tr. 283]. Certainly, these notes describing symptoms of anxiety and depression and an inability to perform personal hygiene and maintenance indicate psychological and mental impairments rather than just feigning.

Other notes in the record document treatment of major depressive disorder between April 2005 and December 2006.[2] Although the Plaintiff changes medication, throughout this period her symptoms remain constant—irritability, paranoia, anxiety, and depression. Nurse notes from a January 24, 2006 visit state that the patient was bitten by a pet racoon and find evidence of self-mutilation; the accompanying physician notes state that the patient continues to have mood swings. [Doc. 290]. Physician notes from April 18, 2006, state that the Plaintiff continues to have nightmares, suffer from paranoia, and anxiety. [Tr. 289]. The Government cites notes from December 27, 2006, as evidence that by the end of 2006 the Plaintiff's condition was under control. While the Plaintiff did report that she was doing better on December 27, 2006, the physician noted that the Plaintiff remained nervous,

---

[2]Hand-written notes by an unidentified medical doctor are found on pages 286-94 of the transcript. The appellate list of exhibits labels these documents as being from Reaches Community Health Center, but each page clearly states that the records are from the Ridgeview Psychiatric Hospital. Although the medical doctor is not identified, the Plaintiff's brief indicates that the records from the Ridgeview Psychiatric Hospital are those of Dr. Shekat, a medical doctor.

12

irritable, and had the shakes. [Tr. 286]. Further, these final notes rate the Plaintiff's GAF score at 49, an assessment score indicating the presence of serious mental health symptoms. [Tr. 286].

Other "acceptable medical sources" who conducted consultative examinations concluded that the Plaintiff was suffering from anxiety and depressive impairments, although they, like Ms. Branton concluded that the Plaintiff's allegations were not altogether credible. George T. Davis, Ph.D., ("Dr. Davis") completed a psychiatric review technique of the Plaintiff on March 1, 2005. In notes from the consultation, Dr. Davis stated that the Plaintiff's allegations were not all together credible, but nonetheless, he diagnosed the Plaintiff as having anxiety and depression, alcohol abuse, and postraumatic stress disorder. [Doc. 178]. As to the depressive disorder, Dr. Davis specifically found the Plaintiff to have major depressive disorder. [Tr. 169].

Warren Thompson, Ph. D., ("Dr. Thompson") found that the Plaintiff's reports of her symptoms were not entirely credible, but despite a note regarding Plaintiff's exaggeration, Dr. Thompson "ruled out" malingering, somatization, factitious disorders. [Tr. 234]. Putting aside Dr. Thompson's seemingly contradictory observations, Dr. Thompson ultimately diagnosed the Plaintiff as suffering from major depressive disorder and found that her alcohol abuse was in early remission. [Tr. 234]. Finally, Jeffrey Summers, M.D., an "appropriate medical source" opined after his February 15, 2005 examination of the Plaintiff that she suffered from anxiety/depression, [Tr. 143], and although this diagnosis is outside of Dr.

Summers' expertise, it further solidifies an overarching acknowledgment that the Plaintiff suffers from depression and anxiety disorders.

Additional records from "other medical sources," who saw the Plaintiff over an extended period of time concluded that she suffered from a depressive disorder. Ami Brown, CMSW, at the Ridgeview Psychiatric Hospital conducted five one-on-one therapy sessions with the Plaintiff between October 2004 and February 2005. Notes from each of these sessions describe the Plaintiff as having major depressive disorder and anxiety issues, specifically, those relating to sexual abuse by her father. [Tr. 191, 193, 195, 198, 200-01]. Albert Cardwell, PA-C, ("Mr. Cardwell") saw the Plaintiff twice in the spring of 2005 and diagnosed the Plaintiff with anxiety/depression. [Tr. 214]. Finally, the Court looks at the function reports completed by Nina Sue Pierce ("Ms. Pierce")[3] and Lenore Turpin ("Ms. Turpin"). While these documents garner the least weight among the sources reviewed because they are "other sources" and are not from medical professionals, they support the evidence of the Plaintiff's severe depression and anxiety. Among other things, Ms. Pierce notes that: the Plaintiff lives in a camper in the woods behind her ex-husband's house with an electrical cord run from the house for power [Tr. 69]; the Plaintiff cannot sleep [Tr. 70]; that she and another lady switch nights coming to the Plaintiff's camper to give the Plaintiff her medication [Tr. 71]; the Plaintiff never prepares meals just sandwiches [Tr. 71]; the

---

[3]Ms. Pierce and another friend, Theda Mayes, drove the Plaintiff to her medical visits, and Ms. Mayes was present at the ALJ's examination. The necessity of these women's roles in caring for the Plaintiff is further evidenced by physicians and other medical sources allowing Ms. Pierce to engage in the Plaintiff's treatment. For example, Dr. Moffett cc'ed Ms. Pierce on his letter to Mr. Cardwell regarding treatment of the Plaintiff. [Tr. 261].

14

Plaintiff washes a couple of loads a week for her ex-husband in exchange for living on his property [Tr. 71]; the Plaintiff only leaves the camper three times per month, when she has medical appointments, because "she is afraid someone might see her" and "is afraid of people" [Tr. 72]; the Plaintiff "lives in a different world" [Tr. 72]; Ms. Pierce shops for the Plaintiff's basic necessities [Tr. 72]; the Plaintiff is "withdrawn from everyone (period). She doesn't trust people or family" [Tr. 74]; the Plaintiff is afraid of authority figures and doctors [Tr. 75]; and the Plaintiff allows Ms. Pierce to visit her but only because she promises not to bring other people [Tr. 76]. In a final description of the Plaintiff, Ms. Pierce explains:

> I have never seen such a [sic] abused child inside of a 45 year old body so bad in my life. We became friends and she told me why she hated people and didn't trust nobody. She had been abused as a child and then it went on over into teenage years and then on over in too [sic] marriage years. She had tried to kill herself many times and failed, mostly because someone found her and they took her and pumped her stomach. She cuts herself to try to kill her pain which I don't understand, but the therapist does.

Ms. Turpin's function report describes the same problems and characteristics and notes that the Plaintiff's "way of handling stress is self mutilation." [Tr. 93]. "She is so afraid of life, when my mom first met her she couldn't get her out of the house, it took about six months to gain her trust even get her to a phyciatrist [sic]." [Tr. 93]. In regards to the self mutilation, Ms. Turpin notes "I thought she has to be crazy to destroy her body like she was doing, I really feel she needs some help because she's a loner [and] she can't function in society." [Tr. 94].

Ms. Branton is also not a psychologist, nor is she classified as an "acceptable medical source," and in contrast to the primary care physicians, mental health professionals, and friends who saw the Plaintiff regularly, Ms. Branton saw the Plaintiff only once, at the single evaluation. The Court finds that the ALJ's heavy reliance on Ms. Branton, specifically her suspicions of exaggeration, was misplaced.

2.    *Impairments Listed in 20 C.F.R. Part 404, Subpart P, Appendix 1*

The Plaintiff first argues that the ALJ erred in his evaluation of her mental impairments by finding that she did not meet the criteria for a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. At the second step of the sequential analysis, the ALJ concluded that the claimant had two severe impairments—substance abuse disorder and a personality disorder—but determined that neither of these impairments met a listed impairment description. [Doc. 17]. The Plaintiff maintains that she meets the criteria for impairment contained in 20 C.F.R. Part 404, Subpart P, Appendix 1, listing 12.05, which addresses mental retardation. The Government maintains that the ALJ's determination was supported by substantial evidence because the Plaintiff has presented no evidence that she manifested deficits in intellectual or adaptive functioning prior to age 22. [Doc. 17].

Because the Plaintiff received a verbal IQ score of 65 on her IQ examination, her impairment is evaluated under part C or part D of listing 12.05, which address claims based upon IQ scores ranging from 60-70. The Plaintiff must also satisfy the capsule definition contained at the beginning of listing 12.05 which requires proof of "significant subaverage general intellectual functioning with deficits in adaptive functioning initially manifested

16

during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 71 Fed. Reg. 10419, 10423 (2006) (final rule) ("[T]o meet listings 12.05 and 112.05, you must have mental retardation that satisfies the criteria in the introductory paragraph of those listings (the so-called capsule definition) in addition to the criteria in one of the paragraphs that follows the capsule definition . . . .")

The Court agrees with the Government that the record does not contain any evidence of mental retardation prior to age 22. The Plaintiff cites the verbal IQ score from IQ testing administered by Ms. Branton as evidence of her mental retardation. This test was administered long after age 22, and obviously cannot satisfy the requirement that the condition be manifested prior to age 22. The Plaintiff also cites the mental impairments that have resulted from the physical and sexual abuse by her father that she suffered in her childhood. The evidence in record indicates that this abuse resulted in depressive and anxiety issues, but there is no evidence of record that this abuse resulted in subaverage intellectual functioning prior to age 22. Because there is no evidence of that deficits in intellectual and adaptive functioning manifested themselves prior to age 22, the criteria contained in the capsule definition have not been met. Accordingly, the Court finds that the ALJ's conclusion that the Plaintiff did not satisfy the requirements of listing 12.05 is supported by substantial evidence.

17

*3.      Availability of Work in the National Economy in Light of the Plaintiff's Exertional and Nonexertional Limitations*

Finally, the Plaintiff argues the ALJ erred by relying upon the Medical-Vocational guidelines ("the grids") contained in 20 C.F.R. Part 404, Subpart P, Appendix 2, and concluding that jobs that the claimant could perform existed in significant numbers in the national economy. [Doc. 13-3]. The Government maintains that non-exertional limitations were not present, and the ALJ properly relied upon the grids in finding that the Plaintiff was not disabled. [Doc. 17].

In the final step of the disability determination, the ALJ relied upon the grids to determine that the Plaintiff was not disabled, but the ALJ noted:

> When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).
>
> The claimant's ability to perform work at all exertional levels has been compromised by nonexertional limitations. Even if the claimant stopped the substance abuse, these nonexertional limitations would have little or no effect on the occupational base of unskilled work at all exertional levels. A finding of "not disabled" is therefore appropriate under the framework of section 204.00 in the Medical-Vocational Guidelines.

[Tr. 21-22].

As stated above, at the fifth step of the sequential analysis the Commissioner bears the burden of proving that jobs that the claimant is capable of performing are available in the national economy. *Her*, 203 F.3d at 391. An ALJ is to employ the grids at the fifth step of the sequential analysis after finding that the claimant does not to meet the requirements of a listed impairment but nevertheless is incapable of performing past work. *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008). However, an ALJ may not rely on the grids alone where the evidence shows that a claimant has nonexertional impairments that preclude the claimant from performing work at a given level. *Id.* at 424. "[W]here a claimant has nonexertional impairments alone or in combination with exertional limitations, the ALJ must treat the grids as only a framework for decisionmaking, and must rely on other evidence to determine whether a significant number of jobs exist in the national economy that a claimant can perform." *Id.* "Reliance upon the grids in the presence of nonexertional limitations requires reliable evidence of some kind that the claimant's nonexertional limitations do no significantly limit the range of work permitted by [the claimant's] exertional limitations." *Id.* (quoting *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987)).

Nonexertional limitations "encompass mental, sensory, or environmental limitations." *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 772 (6th Cir.1987). Thus, in this case, the ALJ could rely on the grids as a framework, but he was also required to consult "reliable evidence" to establish that the Plaintiff's nonexertional limitations do no significantly limit the range of work permitted by the Plaintiff's exertional limitations. *Jordan*, 548 F.3d at 423. The Government states in its memorandum that the ALJ relied, in

part, on the testimony of a vocational expert in making his residual functional capacity determination. [Doc. 17 at 2]. However, the Court has reviewed the transcript of the ALJ's hearing [Tr. 312-334] and the ALJ's decision [Tr. 15-22], and the Court has found no evidence that a vocational expert was ever consulted or was relied upon by the ALJ.

The above quoted portion of the ALJ's decision contains the ALJ's deliberation regarding the Plaintiff's nonexertional impairments and their relation to the grid. The ALJ's statement says both that the Plaintiff's ability to perform work "has been compromised by nonexertional limitations" and that the "nonexertional limitations would have little or no effect on the occupational base of unskilled work at all exertional levels." [Tr. 22]. The ALJ's statement about nonexertional limitations is internally inconsistent, but ends with a statement that a finding of "not disabled" is appropriate under the grids. [Tr. 22].

The inconsistency in the ALJ's discussion can be resolved in two different ways, but the Court finds that either resolution leads to a conclusion that the ALJ's decision is not supported by substantial evidence. First, the most likely explanation for the inconsistency is that the ALJ left out the word "not" prior to his statement about compromise, so that the sentence would have read, "The claimant's ability to perform work at all exertional levels has **not** been compromised by nonexertional limitations." This reading is consistent with the ALJ's quickly turning to the grids after making this statement, because using the grids as a strict guide, as the ALJ did, only makes sense if he found that the nonexertional limitations had no effect.

While the Court acknowledges that a Ms. Branton and other consultative sources believed the Plaintiff was exaggerating her symptoms, the Court concludes that medical records from programs who treated the Plaintiff like Reaches Community Health Center and the Ridgeview Psychiatric Hospital; other consulting medical sources like Dr. Summers; "other medical sources," like Ms. Brown and Mr. Cardwell; and from those around the Plaintiff establish that nonexertional limitations—specifically psychological impairments in the form of anxiety and depressive disorders—existed. The Court finds that the Plaintiff's psychological impairments were nonexertional limitations even though the impairments may not have been severe enough to satisfy a listed impairment or change the Plaintiff's residual functional capacity.

The evidence of record shows that the Plaintiff's mental impairments, despite medical treatment, continue to significantly limit her ability to interact with the outside world, whether it be her doctors, her community, commercial institutions, or any of the other institutions one comes into contact with in the course of living. Though the extent of her prior abuse is not completely clear, the Plaintiff has been abused by her father and her husband and has a fear of people and life that has lead to reclusiveness and a propensity toward self-harm, both of which would likely affect her ability to work. Further, evidence that the Plaintiff keeps a raccoon as a pet, cannot address the basics of feminine hygiene, and "is afraid of the outside world" indicate underlying nonexertional impairments that will negatively affect the Plaintiff's ability to find work.

Thus, if the ALJ intended to say that the Plaintiff's nonexertional limitations did not compromise the Plaintiff's ability to do work, the Court finds that this determination is not supported by substantial evidence because, while the Plaintiff's mental impairments may not garner a disability determination on their own, it is almost certain that they would affect the availability of work to her in the national economy.

Looking at the other possible interpretation of the ALJ's analysis, the ALJ may have been indicating that the nonexertional limitations had compromised the Plaintiff's abilities, and thus, the ALJ may have intended to use the grids as a "framework." This interpretation is attenuated since the ALJ appears to go straight to section 204.00 of the grids and find, without discussion, that the Plaintiff is not disabled, but notwithstanding, the Court finds that even if the ALJ used the grids as a framework, the ALJ's decision is not supported by substantial evidence because he failed to consult "reliable evidence" to establish that the nonexertional limitations do not significantly limit the range of work permitted by the Plaintiff's exertional limitations. *See Jordan*, 548 F.3d at 423. Specifically, he failed to consult a vocational expert and did not note any evidence of record in his decision which would consititue reliable evidence that the above described mental issues would not significantly limit the range of work permitted by the Plaintiff's exertional limitations.

The Court recognizes that "the mere possibility of a nonexertional impairment is insufficient" to overturn a decision based upon improper application of the grids. *Kimbrough v. Sec'y of Health & Human Servs.*, 801 F.2d 794, 796 (6th Cir. 1986). However, the Court finds that it is very likely that a nonexertional impairment which would prevent the Plaintiff from finding work in the national economy exists because as Social Security Ruling 85-15 explains:

> the potential job base for mentally ill claimants without adverse vocational factors is not necessarily large even for individuals who have no other impairments, unless their remaining mental capacities are sufficient to meet the intellectual and emotional demands of at least unskilled, competitive, remunerative work on a sustained basis [and] . . . a finding of disability can be appropriate for an individual who has a severe mental impairment which does not meet or equal the Listing of Impairments, even where he or she does not have adversities in age, education, or work experience.

Based on the foregoing, the Court finds that the ALJ erred in his reliance on the grids at the fifth step in the sequential analysis, and accordingly, the ALJ's conclusion that there would be a significant number of jobs available in the national economy that the Plaintiff could perform was not supported by substantial evidence.

## V. CONCLUSION

Accordingly, the Court finds that the ALJ erred in his application of the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and that the resulting decision that the Plaintiff is not disabled is not supported by substantial evidence. Therefore, the Court will grant Plaintiff's Motion for Summary Judgment [Doc. 13]; will deny

23

Defendant's motion for summary judgment [Doc. 16]; the Commissioner's decision in this case denying Plaintiff's application for benefits under the Social Security Act will be reversed; and this case will be remanded pursuant to sentence four of 42 U.S.C. § 405(g) for a new hearing consistent with this opinion

An order reflecting this opinion will be entered.


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE